IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

RICO CLARK,
SHELBY TURNER, and
NATHANIAL FLEMING,

        Plaintiff,

v.

J.B. PRITZKER,
ROB JEFFREYS,
WARDEN WILLIS,
WEXFORD HEALTH SOURCES, INC.,
JOHN DOE 1, and
HINTON,

        Defendants.

Case No. 20-cv-01133-SPM

## MEMORANDUM AND ORDER

**MCGLYNN, District Judge:**

    Plaintiffs Rico Clark, Shelby Turner, and Nathanial Fleming, inmates of the Illinois Department of Corrections who are currently incarcerated at Menard Correctional Center ("Menard"), bring this civil rights action pursuant to 42 U.S.C. § 1983. Plaintiffs claim that they have been subjected to unconstitutional conditions of confinement and denied adequate health care during the COVID-19 pandemic. (Doc. 1). Plaintiffs seek injunctive and monetary relief. Along with the Complaint, Plaintiffs have filed a Motion for Preliminary Injunction. (Doc. 2).

    Before addressing the request for injunctive relief, the Court must first review the Complaint under 28 U.S.C. § 1915A. Under Section 1915A, any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or requests money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b). At this juncture, the factual allegations of the *pro se* Complaint are to be liberally construed. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

**PRELIMINARY MATTER – FILING FEE**

Although the Plaintiffs have brought their claims jointly in a single lawsuit, group litigation does not relieve any prisoner of the duties imposed upon each Plaintiff under the Prisoner Litigation Reform Act, including the duty to pay the full amount of the filing fees, either in installments or in full if the circumstances require it. *Boriboune v. Berge*, 391 F.3d 852 (7th Cir. 2004). At this time, none of the Plaintiffs have paid the $400 filing fee in this case or sought leave to proceed *in forma pauperis* ("IFP"). *See* 28 U.S.C. § 1914(a). As a matter of course, the Clerk of Court has sent notice that Plaintiffs have 30 days to either pay the fee or move for IFP status. (Doc. 6). Regardless, because Plaintiffs seek immediate emergency injunctive relief, the Court will take up the case now. *See Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680 (7th Cir. 2012). The Plaintiffs must, however, still meet their obligations with regard to the filing fee. To be clear, ***each Plaintiff*** must either pay the $400 filing fee or submit a motion for leave to proceed IFP in this action, together with his inmate trust fund account statement for the six-month period prior to the filing date of this case no later than **November 30, 2020**. If any Plaintiff fails to either pay or submit an IFP motion, he will be dismissed from this action for failure to comply with an order of the Court. *See* FED. R. CIV. P. 41(b).

**THE COMPLAINT**

Plaintiffs make the following allegations: Menard is overcrowded, and Wexford Health Sources, Inc. ("Wexford"), the company contracted to provide health care to inmates within IDOC, deliberately understaffs the health care unit at Menard in an effort to save money. (Doc. 1, p. 5, 9, 41-42). Wexford also attempts to save money by not adequately training medical staff and allowing nonmedical personnel to make decisions that affect medical care. (*Id.* at p. 42, 45). As a result, inmates at Menard do not receive adequate medical, mental health, and dental care. (*Id.* at p. 6). Defendants Pritzker, the Governor of Illinois, Jeffreys, Director of IDOC, and Willis, Warden of

Menard, have been made aware of these issues because of inmate grievances and lawsuits pertaining to the same. (*Id.* at p. 6-7). Despite being put on notice that inmates were being provided inadequate care by Wexford, Defendants have failed to fix the problems and to prevent Wexford from understaffing the health care unit. (*Id.* at p. 9-10). This has created an atmosphere at Menard of lawlessness, where there are no consequences for correctional officers, medical staff, and prison administration personnel who deny or provide inadequate healthcare to inmates. (*Id.* at pp. 10, 12, 15, 27).

Additionally, Defendants Pritzker, Jeffreys, and Willis have also created an ineffective grievance process. When an inmate grieves mistreatment or inadequate medical care, the grievances are reviewed by the people running the prison who are friends, co-workers, and relatives of the staff who are the subject of the grievance. (*Id.* at p. 11). Grievances then go missing. (*Id.*). Defendants were put on notice of the problems with the grievance filing system by the countless grievances and lawsuits that have been filed but nothing has been done to fix these problems. (*Id.* at p. 11-12).

The problems regarding overcrowding, inadequate medical care, and grievance procedures have continued and contributed to Defendants' failure to protect inmate health and safety during the COVID-19 pandemic. (*Id.* at p. 40, 43, 45).

Plaintiffs are three African American men who have tested positive for COVID-19 and were quarantined in unconstitutional conditions in South Cell House at Menard. (*Id.* at p. 20, 39, 48). COVID-19 is more detrimental to African Americans, and Menard has an inmate population that is over sixty-five percent African American. (*Id.* at p. 20, 29). Defendants, Pritzker, Jeffreys, and Willis, along with John Doe #1, the Medical Director of IDOC, Hinton, the Director of Mental Health, and Wexford, are the policy makers responsible for making the decisions regarding COVID-19 protocols, including, what to do when inmates or staff contract COVID-19, where to

quarantine inmates, what type of care to provide, the type of cleaning supplies needed, and assessing the condition of each building. (*Id.* at p. 21-22, 23, 26). During the COVID-19 pandemic, Defendants have failed to enforce existing safety protocols and implement necessary measures to prevent the spread and exposure of COVID-19 and provide adequate medical care at Menard, resulting in Plaintiffs contracting the virus and receiving inadequate care. (*Id.* at p. 22, 26-27).

Menard was placed on quarantine in March 2020. (*Id.* at p. 12). In consultation with the Center of Disease Control, Pritzker, Jeffreys, and Wills issued safety orders, including: (1) the use of social distancing; (2) staying indoors unless necessary to go out for medical care; (3) seek medical care if you develop any COVID-19 related symptoms; (4) keep hands clean; (5) keep surfaces clean; (6) wear a protective mask at all times; and (7) keep nose covered when coughing or sneezing. (*Id.* at p. 13). Officers and medical staff do not, however, follow these orders. Staff do not wear masks and social distancing protocols are not followed. (*Id.* at pp. 14, 44). Staff will have twenty to twenty-five inmates shower at a time in a room with only eight functioning shower heads, inmates are double celled in small cells built for one inmate, and inmates, including Plaintiffs, are repeatedly placed in holding cells with more than twelve other inmates. (*Id.* at pp. 14, 17, 40). Inmates placed in the holding cells are not tested or quarantined prior to being sent back to their galleries. (*Id.* at p. 18). Cells that have contained an inmate with COVID-19 are not being cleaned or wiped down before housing another inmate in the cell. (*Id.* at p. 39). Inmates are not given adequate water to drink and to wash their hands or supplies to clean themselves and their cells. (*Id.* at pp. 40, 44). Staff are discouraging inmates from reporting when they are unwell or experiencing COVID-19 symptoms. (*Id.* at 29, 32, 35, 37). Plaintiffs wrote letters, grievances, and contacted friends and family members to notify Defendants that staff at Menard did not follow the proper safety procedures. (*Id.* at p. 13, 31). Defendants ignored the complaints and have failed to enforce compliance with safety protocols, which placed Plaintiffs at risk of contracting COVID-

19. (*Id.* at p. 13-14, 17).

At the direction of Defendants, initially, inmates who tested positive for COVID-19, reported associated symptoms, or had a fever were quarantined in North 2 Segregation Housing Unit, in disciplinary segregation type conditions. (*Id.* at p. 18, 19, 23). At this time, North 2 also housed segregation inmates who had not been previously exposed to COVID-19. (*Id.* at p. 18). When the segregation inmates were released from segregation to general population, they contaminated other inmates and spread the virus. (*Id.* at p. 19). Defendants then began to quarantine any gallery where an inmate received a positive test result for COVID-19. (*Id.* at p. 20). Although the gallery was quarantine, the cellhouse workers who are inmates, the correctional officers, and the medical staff were not quarantined and would move throughout the different galleries, spreading the virus through the entire cell house. (*Id.*).

Defendants then ordered for South Cell House, a cell house that had been condemned and closed for construction, to reopen and used to house quarantined inmates. (*Id.* at p. 23). The cell house does not have hot water and the cold water coming from the sinks is brown, contains black specks, and smells of feces. (*Id.* at p. 24). The cell house is dirty and has mice, spiders, roaches, and dust mites. (*Id.* at p. 24, 38). It also has black mold on the walls and problems with the plumbing causing the toilets to "back up." (*Id.* at p. 24). Defendants claim that bleach water and soap were to be passed around three times a week to clean the cells, but this is not happening. (*Id.* at p. 38). Defendants were informed but did not do anything to fix the filthy living conditions. (*Id.* at p. 23, 38). Inmates quarantined in South Cell House were subjected to inhuman living conditions and denied basic necessities such as access to exercise, medical care, mental health care, dental care, legal visits, the law library, personal property, commissary, and showers. (*Id.* at pp. 22, 25, 26).

Because inmates know they will be housed in South Cell House if they tested positive for

COVID-19, inmates hide their symptoms and do not report when they were sick, increasing exposure and the spread of the virus at Menard. (*Id.* at p. 26, 31). Staff try to deter inmates from reporting that they are sick by threatening them with quarantine, where they are placed in segregation type conditions. (*Id.* at p. 38).

At the direction of Willis and Jeffreys, nonmedical staff, Wexford and medical staff have canceled all medical, mental health, and dental passes. (*Id.* at pp. 20, 46). Wexford has not offered medical care to inmates during this pandemic, resulting in inmates being denied care, even if they have COVID-19 symptoms. (*Id.* at p. 46). Nurses were not doing temperature checks, seeing inmates at sick call or outpatient appointments, or making rounds in the cell houses to check on inmates. (*Id.* at p. 46).

*Plaintiff Rico Clark*

Plaintiff Clark was housed in segregation in North 2 when Defendants began using the cell house to quarantine inmates, exposing him to COVID-19. (*Id.* at pp. 19, 35). Almost immediately upon being released from segregation and relocated to East Cell House, Clark began to feel sick. (*Id.* at p. 36). He experienced headaches, body aches, cramps in his back, fever, chills, sweats, and loss of smell and taste. (*Id.*). In violation of the social distancing policy, he was placed in a shower with around sixteen other inmates. (*Id.* at p. 37). He verbally reported to staff that he did not feel well and was threatened that he would be quarantined, where he could not shower, and his property would be inventoried, taken to property, and searched. (*Id.*). When he asked why he could not take his property with him to quarantine, he was told, "thats how shit is going when you guys complain or test positive for the COVID. Makes you wish you would have kept your mouth shut hunh?" (*Id.*).

Clark was taken to South Cell House where he was without his legal correspondence box and documents. He could not send out any legal or regular mail, and he had a pending motion in

Page 6 of 20

the criminal courts. (*Id.* at p. 38).

After quarantine, Clark was placed back into his cell in East Cell House, where he had previously tested positive for COVID-19. (*Id.* at p. 39). The cell had not been thoroughly cleaned or disinfected.

*Plaintiff Shelby Turner*

Plaintiff Turner complained to medical staff and correctional officers that he was having body pains, headaches, a fever, night sweats, and chills. (*Id.* at p. 29). Staff ignored his complaints and tried to discourage him from reporting his symptoms because they were understaffed and COVID-19 was forcing staff to work harder than they wanted to work. (*Id.*). Turner complained about his health conditions for three weeks, during which time he suffered in pain. (*Id.*). He was eventually seen by a nurse and texted positive for COVID-19. (*Id.* at p. 30). He was taken to South Cell House and placed in quarantine in unconstitutional conditions. (*Id.*). Turner was forced to leave his personal property in his cell and was not allowed to take his property with him to South Cell House. He was told by a correctional officer and nurse "I bet you wish you never complained because now you going to the fucked up cell house for quarantine without your property." (*Id.* at p. 31).

After quarantine, Turner returned back to his cell in East Cell House, where he had previously tested positive for COVID-19. (*Id.* at p. 39-40). The cell had not been thoroughly cleaned or disinfected.

*Plaintiff Nathanial Fleming*

Plaintiff Fleming submitted a sick call requests and verbally complained to correctional officers and medical staff that he was not feeling well and that he thought he had COVID-19. (*Id.* at p. 32). He was ignored and told by nurses that "quarantine is messed up." (*Id.*). He experienced severe and extreme body aches, spasms in his back, arms, and legs, cramps in his side and legs,

headaches, sweats, chills, and hot flashes. The nurses made him feel like if he kept complaining then he would be sent to segregation or punished because he had been exposed to COVID-19. (*Id.*). Fleming sent a message to a friend stating he did not feel well and whoever was monitoring the messages sent medical staff to his cell to test him for COVID-19. (*Id.* at p. 32-33). Fleming was told by a correctional officer and nurse that he made them look bad by "going over their heads" with his complaint. (*Id.* at p. 33). The nurse told Fleming, "I guarantee you're not going to like quarantine." (*Id.* at p. 34). He was then moved to South Cell House without his property. (*Id.* at p. 34). In South Cell House, Fleming was told by a correctional officer that he should not have written grievances. (*Id.* at p. 35). Fleming had never received a response for his grievance and so, the comment revealed that the grievance was received by Menard staff but thrown away or ignored, making the exhaustion process unavailable. (*Id.* at p. 35) .

After quarantine, Fleming was placed back into the cell in East Cell House, where he had previously tested positive for COVID-19. (*Id.* at p. 39-40). The cell had not been thoroughly cleaned or disinfected.

## DISCUSSION

Based on the allegations of the Complaint, the Court finds it convenient to designate the following Counts:

**Count 1:** Eighth Amendment claim against Pritzker, Jeffreys, and Willis for overcrowded conditions at Menard, which subjected Plaintiffs to unconstitutional conditions of confinement, including the failure to follow COVID-19 safety protocols and delay of medical treatment.

**Count 2:** Eighth Amendment claim of against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton for failing to enforce and implement necessary safety protocols to protect Plaintiffs from the spread of and exposure to COVID-19.

**Count 3:** Eighth Amendment claim of denial of adequate medical care against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton for providing Plaintiffs delayed and inadequate treatment after they contracted

|           |                                                                                                                                                                                                 |
|-----------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|           | COVID-19.                                                                                                                                                                                       |
| **Count 4:** | Eighth Amendment claim of cruel and unusual punishment against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton for quarantining Plaintiffs in unconstitutional conditions of confinement. |
| **Count 5:** | Eighth Amendment claim against Wexford for denial of adequate medical care to Plaintiffs.                                                                                                      |
| **Count 6:** | State law claim of intentional infliction of emotional distress against Pritzker, Jeffreys, Willis, John Doe #1, Hinton, and Wexford.                                                          |
| **Count 7:** | Fourteenth Amendment due process claim against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton for implementing an ineffective grievance system.                                           |
| **Count 8:** | First Amendment claim against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton for denying Plaintiffs access to the law library and mail.                                                   |

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. **Any other claim that is mentioned in the Complaint but not addressed in this Order should be considered dismissed without prejudice as inadequately pled under the *Twombly* pleading standard.[1]**

### Count 1

It has long been held that prison overcrowding is not a *per se* constitutional violation. *See Rhodes v. Chapman,* 452 U.S. 337, 348 (1981). "Accordingly, an inmate's constitutional challenge to prison conditions requires a two-part examination." *Townsend v. Fuchs,* 522 F.3d 765, 773. First, a plaintiff must establish that the prison was overcrowded, and that the overcrowding led to intolerable conditions, such as the deprivation of medical care, food, sanitation, or an increase in violence (objective component). *Id.*; *see also French v. Owens,* 777 F.2d 1250, 1253 (7th Cir. 1985). Second, a plaintiff must demonstrate that the defendant acted with deliberate indifference

---

[1] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

with respect to the conditions (subjective component). *Townsend*, 522 F.3d at 773 (quoting *Farmer v. Brennan*, 511 U.S. 832, 834 (1994)).

Plaintiffs claim that because Menard is severely overcrowded, Plaintiffs were unable to properly social distance to prevent exposure to COVID-19, and then once they contracted COVID-19, necessary treatment was delayed because there was not enough staff to treat all the inmates at Menard. (Doc. 1, p. 40). Defendants Pritzker, Jeffreys, and Willis were put on notice prior to the pandemic that the overcrowding at Menard was causing inmates to receive inadequate medical care, and during the pandemic, Defendants have continued to be informed of the effects of overcrowding through grievances and complaints. Specifically, Plaintiff Turner was discouraged by medical staff from seeking treatment for his COVID-19 symptoms because Menard is understaffed. (Doc. 1, p. 29). These allegations adequately plead a claim for unconstitutional conditions of confinement due to overcrowding.

**Count 2**

"The Eighth Amendment prohibits prison officials from knowingly disregarding substantial risks of serious harm." *Riley v. Ewing,* 777 F. App'x 159, 162 (7th Cir. 2019). And while liability under Section 1983 requires personal involvement in the alleged constitutional violation, an individual setting prison policy may be liable "if they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy." *Sinn v. Lemmon,* 911 F.3d 412, 423 (7th Cir. 2018) (internal citations and quotations omitted). *See also Gossmeyer v. McDonald,* 128 F.3d 481, 495 (7th Cir. 1997) (noting that "personal involvement is a prerequisite for individual liability in a § 1983 action"). Plaintiffs claim that (1) Defendants were informed that COVID-19 safety protocols were not being followed by staff and insufficient to prevent the spread of the virus at Menard; and (2) despite this knowledge, Defendants failed to take action to ensure that inmates were adequately protected from exposure to and spread of

COVID-19. (*See* Doc. 1, pp. 27, 28, 34). As a result, Plaintiffs contracted the virus. This is sufficient for Count 2 to proceed against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton.

**Count 3**

Plaintiffs allege that Defendants suspended all inmate access to medical, mental health, and dental care during the pandemic. As a result, Plaintiffs were not promptly treated when they began experiencing COVID-19 associated symptoms, and their requests for medical care were ignored. (Doc. 1, p. 46). Defendants were aware that staff were delaying and denying medical treatment and threatening inmates who displayed COVID-19 symptoms with being quarantined in harsh conditions but did not act to fix the problem. (*Id.* at pp. 31, 32). These allegations are sufficient to establish that Defendants disregarded an excessive risk to their health, specifically regarding the treatment of COVID-19 and associated symptoms, and Count 3 shall proceed against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton.

The general claim that Defendants violated Plaintiffs' constitutional rights by suspending access to healthcare services, however, is dismissed. (Doc. 1, p. 23, 46, 47). To state claim for denial of adequate medical care Plaintiffs must allege that Defendants "acted with reckless or malicious intent to deny [them] medical care for an objectively serious condition." *Elock v. Davidson,* 561 F. App'x 519, 523 (7th Cir. 2014). Other than stating that they were diagnosed with COVID-19, Plaintiffs have not asserted that they suffered from any other type of medical, dental, or mental health condition that required treatment. Because they did not require medical treatment for any other health condition, the policy decision to suspend healthcare services did not violate their right to adequate healthcare.

**Count 4**

Plaintiffs claim that they were quarantined for two weeks in a condemned building with mice, spiders, and roaches and in unsanitary conditions. During this time, they were denied access

to potable water, showers, exercise, the commissary, the law library, mail, and their personal property. Pritzker, Jeffreys, Willis, John Doe #1, and Hinton knew about the conditions of South Cell House and continued to house ill inmates there. At this stage, these allegations state a viable claim for unconstitutional conditions of confinement, and Count 4 will proceed. *See e.g., Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) (lack of access to adequate cleaning supplies, along with infestation of insects stated an Eighth Amendment claim); *Jaros v. Ill. Dep't of Corr.,* 684 F. 3d 667, 670 (7 Cir. 2012) (stating that adequate "facilities to wash and use the toilet are among the minimal civilized measure of life's necessities") (internal citations and quotations omitted); *Smith v. Dart,* 803 F. 3d 304, 314 (7 Cir. 2015) (holding that a jail must provide drinkable water); *Budd v. Motley*, 711 F.3d 840, 842-43 (7th Cir. 2013) (considering the combined effect of prison conditions).

**Count 5**

To maintain an Eighth Amendment claim against Wexford for deliberate indifference, a plaintiff must assert that a policy or practice caused the violation. *Woodward v. Corr. Med. Serv. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004)

Plaintiffs claim that Wexford has a policy of saving costs by understaffing the healthcare unit, not adequately training medical staff to provide medical care in a prison setting, and allowing nonmedical personnel to make decision affecting inmate medical care. These cost saving measures resulted in Plaintiffs being denied medical care because there are not enough staff to treat the inmates with COVID-19 symptoms or who had tested positive results, medical staff are not following proper safety protocols further exposing inmates to the virus, and medical staff are taking direction from nonmedical personnel regarding medical care. (Doc. 1, p. 43-44, 45, 46). This is sufficient for Count 5 to proceed against Wexford for denying adequate treatment to Plaintiffs for COVID-19.

To the extent that Plaintiffs are arguing that Wexford's policy has denied them adequate medical, mental health, and dental care in general, these claims are dismissed. As previously discussed, other than claiming they suffered from COVID-19, Plaintiffs have not alleged that they had a serious medical need that required medical attention — the first element of a deliberate indifference claim.

### Count 6[2]

Plaintiffs allege that Defendants turned a blind eye and did not provide medical or mental health attention to them after they complained that they were not receiving adequate medical care for the COVID-19 virus. (Doc. 1, p. 49). Based on media reports, Plaintiffs believed that they would die after contracting the virus. Because of Defendants' intentional actions, Plaintiffs became depressed and experienced emotional distress. (*Id.*). This is sufficient for Count 6 to survive screening. *See Somberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1030 (7th Cir. 2006) (discussing the elements of intentional infliction of emotional distress under Illinois law).

### Count 7

Count 7 against Defendants Pritzker, Jeffreys, Willis, John Doe #1, and Hinton for implementing an inadequate grievance process will be dismissed. Inmates do not have a constitutional right to an effective grievance procedure. *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996). In fact, the Constitution requires no procedure at all, and the failure of state prison officials to follow their own procedures does not, of itself, violate the Constitution. *Maust v. Headley*, 959 F.2d 644, 648 (7th Cir. 1992); *Shango v. Jurich*, 681 F.2d 1091, 1098 (7th Cir. 1982). Defendants thus incur no liability under Section 1983 for the mishandling of grievances.

---

[2] The state law claim in Count 6 concerns the same facts of the Section 1983 claims, so supplemental jurisdiction is appropriate. *See* 28 U.S.C. 1367(a); *Wisconsin v. Ho-Chunk Nation,* 512 F.3d 921, 936 (7th Cir. 2008).

**Count 8**

Plaintiffs claim that under the COVID-19 safety protocols inmates have been unable to have legal visits, access the law library, and send out mail (Doc. 1, p. 22, 25). Specifically, Plaintiffs Turner and Clark could not take their legal work with them to South Cell House when they were quarantined, and Plaintiff Clark had a motion pending in his criminal case. (Doc. 1, pp. 30, 38). These claims are not sufficient to state a claim for violation of the First Amendment.

To the extent that Plaintiffs are claiming that the two week prohibition on mail during their period in quarantine violated their right to free speech, the Complaint fails to describe actual instances where they attempted to send and receive mail but were unable to do so because of the policy. *Zimmerman v. Tribble,* 226 F. 3d 568, 572-73 (7th Cir. 2000) (finding that the plaintiff failed to state a claim for a First Amendment violation where he complained of only one instance of mail delay). Similarly, Plaintiffs have failed to state a viable claim for denial of access to the courts in violation of the First Amendment. To state a claim for denial of access to courts, a plaintiff must claim that denial of access to the law library, legal documents, or legal assistance "hindered his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). In other words, "the mere denial of access to a prison law library or to other legal materials is not itself a violation of a prisoner's rights; his right is to access *the courts*," and only if the defendants' conduct prejudices a potentially meritorious legal claim has the right been infringed. *Marshall v. Knight*, 445 F.3d 965, 968 (7th Cir. 2006). Mere delay or inconvenience is not an unconstitutional detriment. Here, Plaintiffs do not explain "the connection between the alleged denial of access to legal materials [and the law library] and an inability to pursue a legitimate challenge." *Ortiz v. Downey,* 561 F.3d 664, 671 (citations omitted). Accordingly, Count 8 will be dismissed.

### MOTION FOR APPOINTMENT OF COUNSEL

Plaintiffs have filed a Motion for Appointment of Counsel, which is denied. (Doc. 3). As litigants in a civil case, Plaintiffs do not have a right to counsel. *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007). However, the Court "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915 (e)(1). Plaintiffs, however, have not submitted any documentation to demonstrate to the Court that they are indigent. They have not paid the filing fee and have not filed a motion to proceed *in forma pauperis* in this case. Thus, Court has no basis for concluding that they are unable to afford counsel, as is required by Section 1915(e), and the Motion is denied.

### MOTION FOR CLASS CERTIFICATION

Because Plaintiffs are currently proceeding *pro se,* they cannot represent a class of plaintiffs, and the Motion for Class Certification (Doc. 4) is denied without prejudice. See *Howard v. Pollard*, 814 F.3d 476, 478 (7th Cir. 2015) ("it is generally not an abuse of discretion for a district court to deny a motion for class certification on the ground that a pro se litigant is not an adequate class representative.") (emphasis omitted); *Lawrence v. Sec'y of State*, 467 F. App'x 523, 525 (7th Cir. 2012) (noting that "pro se plaintiffs cannot represent others")

### PRELIMINARY INJUNCTION

As mentioned, Plaintiffs have filed a Motion for Preliminary Injunction claiming that they are still endangered of being exposed to the COVID-19 virus. (Doc. 2). They ask the Court to order Defendants and staff to follow the COVID-19 safety protocols and to monitor their compliance. They also request the Court to order Defendants to reduce the inmate prison population and to stop quarantining inmates with COVID-19 in unconstitutional conditions.

The request for a preliminary injunction will remain pending until Defendants have been served. Defendants are ordered to respond to the request for a preliminary injunction within **14**

**days** of service of the pleadings in this case, at which point the Court will determine the need for a hearing on the motions requesting a preliminary injunction.

### GROUP LITIGATION BY MULTIPLE PRISONERS

Plaintiffs may bring their claims jointly in a single lawsuit if they so desire. But the Court must advise them of the consequences of proceeding in this manner, including their filing fee obligations, and give them an opportunity to withdraw from the case or sever their claims into individual actions.

In addition to the requirement that each Plaintiff must pay a full civil filing fee, as previously discussed, there are at least two other reasons a prisoner may wish to avoid group litigation. First, group litigation creates countervailing costs. Each submission to the Court must be served on every other plaintiff and the opposing parties pursuant to Federal Rule of Civil Procedure 5. This means that if there are two plaintiffs, the plaintiffs' postage and copying costs for filing motions, briefs, or other papers will be twice as much as that of a single plaintiff.

Second, a prisoner litigating on his own behalf takes the risk that "one or more of his claims may be deemed sanctionable under Federal Rule of Civil Procedure 11." *Boriboune*, 391 F.3d at 854-55. On the other hand, a prisoner litigating jointly assumes those risks for all of the claims in the group complaint, whether or not they concern him personally. Also, if the Court finds that the complaint contains unrelated claims against unrelated defendants, those unrelated claims may be severed into one or more new cases, each of which involves an additional filing fee obligation and the risk of a "strike" within the meaning of 28 U.S.C. § 1915(g). Plaintiffs may wish to consider these factors in determining whether to assume the risks of group litigation.

Because not every prisoner is likely to be aware of the potential negative consequences of joining group litigation in federal courts, the Seventh Circuit suggested in *Boriboune* that district courts alert prisoners to the individual payment requirement, as well as the other risks prisoner *pro*

*se* litigants face in joint *pro se* litigation, and "give them an opportunity to drop out." *Id.* at 856. In keeping with this suggestion, the Court will allow Plaintiffs an opportunity to withdraw from this litigation.

In addition, if Plaintiffs desire to continue this litigation as a group, any proposed amended complaint, motion, or other document filed on behalf of multiple plaintiffs must be signed by each plaintiff. A non-attorney cannot file or sign papers for another litigant, and as long as Plaintiffs appear without counsel in this action, each Plaintiff must sign documents for himself. *See Lewis v. Lenc-Smith Mfg. Co.*, 784 F.2d 829, 831 (7th Cir. 1986); FED. R. CIV. P. 11. Plaintiffs are **WARNED** that future group motions or pleadings that do not comply with this requirement shall be stricken pursuant to Rule 11(a).

### DISPOSITION

By **November 30, 2020,** each named Plaintiff is **ORDERED** to advise the Court in writing whether he wishes to continue as a Plaintiff in this group action. Each Plaintiff must also pay the $400 filing fee or file a motion for leave to proceed IFP, in accordance with the Court's previous Order, by **November 30, 2020**. (*See* Doc. 6). Any Plaintiff who advises the Court that he wishes to proceed as a litigant in this case but fails to timely submit a properly completed IFP Motion or filing fee will be obligated to pay the complete filing fee and ***will also be dismissed from this action for want of prosecution and failure to comply with a court order.*** FED. R. CIV. P. 41(b); *Sperow v. Melvin*, 153 F.3d 780, 781 (7th Cir. 1998). If, by **November 30, 2020**, a Plaintiff advises the Court that he does *not* wish to participate in this action, that Plaintiff will be dismissed from the lawsuit and will *not* be charged a filing fee for this action. **This is the *only* way to avoid the obligation to pay the filing fee.**

For the reasons stated above, the Complaint survives screening pursuant to Section 1915A. **COUNT 1** will proceed against Pritzker, Jeffreys, and Willis. **COUNT 2** will proceed against

Pritzker, Jeffreys, Willis, John Doe #1, and Hinton. **COUNT 3** will proceed against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton. **COUNT 4** will proceed against Pritzker, Jeffreys, Willis, John Doe #1, and Hinton. **COUNT 5** will proceed against Wexford. **COUNT 6** will proceed against Pritzker, Jeffreys, Willis, John Doe #1, Hinton, and Wexford. **COUNTS 7** and **8** are **DISMISSED without prejudice.**

The Motion for Appointment of Counsel (Doc. 3) and the Motion for Class Certification (Doc. 4) are **DENIED without prejudice.** The Court **DEFERS** ruling on the Motion for Preliminary Injunctions. (Doc. 2). Defendants are **ORDERED** to respond to the request for a preliminary injunction within **14 days** of service of the pleadings in this case.

The Clerk of Court shall prepare for **Pritzker, Jeffreys, Willis, Wexford,** and **Hinton**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, the Motion for Preliminary Injunction (Doc. 2), and this Memorandum and Order to each defendant's place of employment as identified by Plaintiffs. If a defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that defendant, and the Court will require that defendant pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure. The unknown **John Doe** will not be served until Plaintiffs have properly identified him. After the Defendants have answered, the Court will enter a scheduling order setting forth the specific deadlines for identifying the **John Doe**.

If a defendant who no longer can be found at the work address provided by Plaintiffs, the employer shall furnish the Clerk with that defendant's current work address, or, if not known, his or her last known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only

by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merit Review Order.**

If judgment is rendered against Plaintiffs, and the judgment includes the payment of costs under Section 1915, they will be required to pay the full amount of the costs, whether or not an *in forma pauperis* application is granted. 28 U.S.C. § 1915(f)(2)(A).

Finally, each Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than 7 days after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:   November 2, 2020**

                                        *s/Stephen P. McGlynn*
                                        **STEPHEN P. MCGLYNN**
                                        **United States District Judge**

## NOTICE TO PLAINTIFFS

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least **60 days** from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take **90 days** or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiffs are advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiffs need not submit any evidence to the Court at his time, unless otherwise directed by the Court.