IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| NATHANIAL FLEMING, #S08166, <br><br> Plaintiff, <br><br> v. <br><br> J.B. PRITZKER, ROB JEFFREYS, ANTHONY WILLS, WEXFORD HEALTH SOURCES, INC., JOHN DOE 1, and MELVIN HINTON, <br><br> Defendants. | Case No. 20-cv-01133-SPM |
| RICO CLARK, #M10831, <br><br> Plaintiff, <br><br> v. <br><br> J.B. PRITZKER, ROB JEFFREYS, ANTHONY WILLS, WEXFORD HEALTH SOURCES, INC., JOHN DOE 1, and MELVIN HINTON, <br><br> Defendants. | Case No. 21-cv-00153-SPM |
| SHELBY TURNER, #M43625, <br><br> Plaintiff, <br><br> v. <br><br> J.B. PRITZKER, ROB JEFFREYS, ANTHONY WILLS, WEXFORD HEALTH SOURCES, INC., JOHN DOE 1, and MELVIN HINTON, <br><br> Defendants. | Case No. 21-cv-00154-SPM |

# **MEMORANDUM AND ORDER**

**MCGLYNN, District Judge:**

Plaintiffs Nathanial Fleming, Rico Clark, and Shelby Turner, inmates of the Illinois Department of Corrections ("IDOC") who are currently incarcerated at Menard Correctional Center ("Menard"), initiated this civil rights action *pro se* pursuant 42 U.S.C. § 1983 by jointly filing a single complaint. (Doc. 1, Case No. 20-cv-01133). In the Complaint, Plaintiffs claim that they have been subjected to unconstitutional conditions of confinement and denied adequate health care during the COVID-19 pandemic. Along with the Complaint, Plaintiffs filed a Motion for Preliminary Injunction asserting that Defendants are not implementing the necessary safety protocols and that they are still in danger of being exposed to the virus. Early on in the case, it became apparent that Plaintiffs were unable to continue efficiently litigating their claims together and in accordance with the Federal Rules of Civil Procedure. Thus, the Court severed the claims of Plaintiffs Turner and Clark into two new separate actions. (*See* Doc. 57, Case No. 20-cv-1133; Case No. 21-cv-00153, Case No. 21-cv-00154). The Complaint, Motion for Preliminary Injunction, and the Court's Merit Review Order were filed in each new case.

Now pending before the Court are the identical Motions for Preliminary Injunction filed by Plaintiffs in their respective cases. Defendants oppose the motions. Plaintiffs Clark and Turner filed reply briefs. (Case No. 21-cv-00153, Doc. 19; Case No. 21-cv-00154, Doc. 15). The Court held a hearing on the motions on May 26, 2021. For the reasons stated on the record and set forth below, the motions are denied.

### BACKGROUND

According to the Complaint filed by Plaintiffs, in response to the COVID-19 pandemic, Menard was placed on quarantine in March 2020. In consultation with the Center of Disease Control, Defendants Governor Pritzker, IDOC Director Jeffreys, and Warden Wills issued safety

protocols, including: (1) the use of social distancing; (2) staying indoors unless necessary to go out for medical care; (3) seek medical care if you develop any COVID-19 related symptoms; (4) keep hands clean; (5) keep surfaces clean; (6) wear a protective mask at all times; and (7) keep nose covered when coughing or sneezing. Defendants, however, failed to enforce these safety protocols and to implement additional necessary measures to prevent the spread and exposure of COVID-19. Staff members do not wear masks and discourage inmates from reporting when they are unwell or experiencing COVID-19 symptoms. Social distancing protocols are not followed. Specifically, around twenty-five inmates are forced to shower in the same shower room with only eight functioning shower heads, inmates are double celled in small cells built for one inmate, and inmates are repeatedly placed in holding cells with more than twelve other inmates and are then not tested or quarantined prior to being sent back to their galleries. Proper sanitary measures are also not being taken. Cells that have contained an inmate with COVID-19 are not being cleaned or wiped down before housing another inmate in the cell, and inmates are not given adequate water to wash their hands or supplies to clean themselves and their cells.

At the direction of Defendants, initially, inmates who tested positive for COVID-19, reported associated symptoms, or had a fever were quarantined in North 2 Segregation Housing Unit, in disciplinary segregation type conditions. At this time, North 2 also housed segregation inmates who had not been previously exposed to COVID-19. When the segregation inmates were released from segregation to general population, they contaminated other inmates and spread the virus. Defendants then began to quarantine any gallery where an inmate received a positive test result for COVID-19. Although the gallery would be put under quarantine, the inmate cellhouse workers, the correctional officers, and the medical staff were not quarantined and would move throughout the different galleries, spreading the virus through the entire cell house.

Eventually, Defendants reopened South Lower Cell House to house quarantined inmates. According to Plaintiffs, South Lower Cell House had previously been condemned and closed for

construction. South Lower Cell House does not have hot water, and the cold water coming from the sinks is brown, contains black specks, and smells of feces. The cell house is dirty and has mice, spiders, roaches, and dust mites. It also has black mold on the walls and problems with the plumbing causing the toilets to "back up." Inmates quarantined in South Lower Cell House are denied basic necessities such as access to exercise, medical care, mental health care, dental care, legal visits, the law library, personal property, commissary, and showers. Because inmates know they will be housed in South Lower Cell House if they tested positive for COVID-19, they hide their symptoms and do not report when they were sick, increasing exposure and the spread of the virus at Menard.

At the direction of Defendants Wills and Jeffreys, who are nonmedical staff, Wexford Health Sources, Inc. ("Wexford") and medical staff have canceled all medical, mental health, and dental passes. Wexford has not offered medical care to inmates during this pandemic, resulting in inmates being denied care, even if they have COVID-19 symptoms. Nurses are not doing temperature checks, seeing inmates at sick call or outpatient appointments, or making rounds in the cell houses to check on inmates.

Plaintiffs further allege that Wexford has a policy of saving costs by understaffing the healthcare unit, not adequately training medical staff to provide medical care in a prison setting, and allowing nonmedical personnel to make decisions affecting inmate medical care. These cost saving measures resulted in Plaintiffs being denied medical care because there are not enough staff to treat the inmates with COVID-19 symptoms or who had tested positive results, medical staff are not following proper safety protocols further exposing inmates to the virus, and medical staff are taking direction from nonmedical personnel regarding medical care.

Because Defendants have not implemented and enforced the necessary safety protocols and made available a sufficient number of well-trained medical staff, Plaintiffs contracted the virus, received inadequate medical care, and then were housed in inhumane conditions in South

Lower Cell House.

*Plaintiff Rico Clark*

Plaintiff Clark was housed in segregation in North 2 when Defendants began using the cell house to quarantine inmates, exposing him to COVID-19. Almost immediately upon being released from segregation and relocated to East Cell House, Clark began to feel sick. He experienced headaches, body aches, cramps in his back, fever, chills, sweats, and loss of smell and taste. In violation of the social distancing policy, he was placed in a shower with around sixteen other inmates. He verbally reported that he did not feel well, and staff threatened him that he would be quarantined without his property, where he could not shower. Clark was taken to South Lower Cell House. After quarantine, Clark was placed back into his cell in East Cell House, where he had previously tested positive for COVID-19. The cell had not been thoroughly cleaned or disinfected.

*Plaintiff Shelby Turner*

Plaintiff Turner complained to medical staff and correctional officers that he was having body pains, headaches, a fever, night sweats, and chills. Staff ignored his complaints and tried to discourage him from reporting his symptoms because they were understaffed and COVID-19 was forcing staff to work harder than they wanted to work. Turner complained about his health conditions for three weeks, during which time he suffered in pain. He was eventually seen by a nurse and texted positive for COVID-19. He was taken to South Cell House and quarantined in unconstitutional conditions. Turner was forced to leave his personal property in his cell and was not allowed to take his property with him to South Cell House. He was told by a correctional officer and nurse "I bet you wish you never complained because now you going to the fucked up cell house for quarantine without your property." After quarantine, Turner returned back to his cell in East Cell House, where he had previously tested positive for COVID-19. The cell had not been thoroughly cleaned or disinfected.

*Plaintiff Nathanial Fleming*

Plaintiff Fleming submitted a sick call requests and verbally complained to correctional officers and medical staff that he was not feeling well and that he thought he had COVID-19. He was ignored and told by nurses that "quarantine is messed up." He experienced severe and extreme body aches, spasms in his back, arms, and legs, cramps in his side and legs, headaches, sweats, chills, and hot flashes. The nurses made him feel like if he kept complaining then he would be sent to segregation or punished because he had been exposed to COVID-19. Fleming sent a message to a friend stating he did not feel well and whoever was monitoring the messages sent medical staff to his cell to test him for COVID-19. Fleming was told by a correctional officer and a nurse that he made them look bad by "going over their heads" with his complaint. The nurse told Fleming, "I guarantee you're not going to like quarantine." He was then moved to South Cell House without his property. In South Lower Cell House, Fleming was told by a correctional officer that he should not have written grievances. Fleming had never received a response for his grievance and so, the comment revealed that the grievance was received by Menard staff but thrown away or ignored, making the exhaustion process unavailable. After quarantine, Fleming was placed back into the cell in East Cell House, where he had previously tested positive for COVID-19. The cell had not been thoroughly cleaned or disinfected.

The Court conducted a preliminary review of the Complaint, under 28 U.S.C. § 1915A, and issued a Merit Review Order. In each case, Plaintiffs are currently proceeding on the following claims:

**Count 1:** Eighth Amendment claim against Pritzker, Jeffreys, and Wills for overcrowded conditions at Menard, which subjected Plaintiffs to unconstitutional conditions of confinement, including the failure to follow COVID-19 safety protocols and delay of medical treatment.

**Count 2:** Eighth Amendment claim of against Pritzker, Jeffreys, Wills, John Doe #1, and Hinton for failing to enforce and implement necessary safety protocols to protect Plaintiffs from the spread of and exposure to COVID-19.

| | |
|---|---|
| **Count 3:** | Eighth Amendment claim of denial of adequate medical care against Pritzker, Jeffreys, Wills, John Doe #1, and Hinton for providing Plaintiffs delayed and inadequate treatment after they contracted COVID-19. |
| **Count 4:** | Eighth Amendment claim of cruel and unusual punishment against Pritzker, Jeffreys, Wills, John Doe #1, and Hinton for quarantining Plaintiffs in unconstitutional conditions of confinement. |
| **Count 5:** | Eighth Amendment claim against Wexford for denial of adequate medical care to Plaintiffs. |
| **Count 6:** | State law claim of intentional infliction of emotional distress against Pritzker, Jeffreys, Wills, John Doe #1, Hinton, and Wexford. |

### PRELIMINARY INJUNCTION MOTION

In the Motion for Preliminary Injunction, Plaintiffs claim that they are still endangered of being exposed to the COVID-19 virus. They ask the Court to order Defendants and staff to follow the COVID-19 safety protocols and to monitor their compliance. They also request the Court to order Defendants to reduce the inmate prison population so that inmates can be singled celled in compliance with social distancing requirements and to stop quarantining inmates with COVID-19 in unconstitutional conditions. In their reply briefs, Plaintiffs Clark and Turner have provided affidavits from fellow inmates stating that they have witnessed staff and nurses not wearing masks or improperly wearing masks with their nose or mouth exposed. The inmates also attest to being placed in bullpens and showers with more than ten other inmates, violating social distancing requirements.

Defendants Jeffreys, Wills, and Hinton (IDOC Defendants) argue that the Court should deny the motion because Plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims regarding their conditions of confinement, and they are not at risk of irreparable harm.

First, they argue Plaintiffs have not made "an objective showing that the conditions are sufficiently serious – i.e.. that they deny the inmate the minimal civilized measure of life's

necessities creating an excessive risk to the inmate's health and safety – and. . . a subjective showing of a defendant's culpable state of mind." (Doc. 26, Case No. 20-cv-01133) (quoting *Money v. Pritzker,* 453 F. Supp. 3d 1103, 1131 (7th Cir. 2020)). In support of their argument, IDOC Defendants point to Institutional Directive 04.03.001, the Pandemic Plain ("Directive"), implemented at Menard. The Directive establishes a comprehensive policy for universal precautions and isolation procedures to diminish and contain the spread of viral infections, including COVID-19, which may pose a pandemic threat to anyone at Menard. The Directive details guidelines for the separation and isolation of inmates to prevent the spread of the virus. All staff members have been made aware of the Directive, and public announcements regarding use of personal protective equipment and safety measures are made at the beginning of each shift. IDOC employees who do not comply with the policies set forth in the Directive face discipline. Any Wexford employee who does not comply with the policies are reported to the Wexford Site Manager for action.

The Directive sets forth detailed guidelines for the separation and isolation of inmates to prevent the spread of the virus. Currently, Menard inmates who are awaiting the results of a COVID-19 test, have been potentially exposed to COVID-19, have been away from the facility for medical care for more than 23 hours, or who are newly transferred to Menard are placed in Quarantine in North 2, 6 gallery. Inmates who test positive for COVID-19 are placed in Medical Isolation in South Lower Cell House for 14 days to mitigate the spread of the virus to other inmates and employees. Inmates in Medical Isolation are seen two times a day by a registered nurse and assessed by a medical provider prior to discharge from Medical Isolation. (Doc. 26-1, Case No. 20-cv-01133). They are single celled and allowed the following personal property items: a T.V.; 2 cable cords; tablet and charger; 1-set of state blues; 1- change of clothes that includes socks; t-shirt and underwear; pair of shoes; thermal under clothes; hygiene items; laundry bag; pen; medications; religious items; and a fan. Inmates also have the opportunity to go to yard in 1 ½ hour time blocks,

25 inmates at a time, and are offered showers three times a week, one offender at a time, in a dedicated shower room in South Upper Cell House. Inmates may refuse yard and showers. Staff members assigned to the South Lower Medical Isolation housing unit use a separate entrance and exit than staff assigned elsewhere. Those staff members are required to change into and out of their work uniforms at Menard and are not allowed to leave the housing unit during their work shift.

Finally, IDOC Defendants explain that during the COVID-19 pandemic all non-essential offender movement at Menard has been suspended, however correctional counselors, mental health professionals, and chaplains tour all cell houses once a week. As of November 11, 2020, Menard has had 163 inmates and 161 staff members test positive for COVID-19. IDOC Defendants argue they have put forth a comprehensive plan for protecting the inmate population at Menard from the virus, and Plaintiffs have been provided treatment in compliance with this comprehensive plan. While the plan may not be the course of action Plaintiffs think is best, the actions of Defendants pass "constitutional muster." (Doc. 26, p. 7, Case No. 20-cv-01133) (quoting *Money* at 1131). Therefore, Plaintiffs are not likely to succeed on the merits of their Eighth Amendment claims.

Second, IDOC Defendants argue that Plaintiffs have not established that they have no other adequate remedy at law and are likely to suffer irreparable harm without an emergency injunction. IDOC Defendants contend that Plaintiffs have all been the recipients of Menard's comprehensive plan for dealing with the COVID-19 pandemic and have now recovered and returned to general population. Other than conclusory allegations as to why double celling should be banned at Menard, Plaintiffs fail to allege any current conditions of their own confinement that rise to the level of a constitutional violation or offer any evidence to support a claim that their safety or health is at risk if double celled following their period in Medical Isolation. Defendants argue that Plaintiffs' request for the Court to enter an order regulating prison management would usurp IDOC's discretionary decisions on offender placement and is counter to case law.

Likewise, Defendant Wexford argues that Plaintiffs cannot demonstrate a likelihood of success on the merits of their Eighth Amendment claim. (Doc. 29, Case No. 20-cv-001133). To succeed on an Eighth Amendment claim against a corporation, Plaintiffs must demonstrate that a policy or practice caused the constitutional violation. Wexford first argues that Plaintiffs' have not identified how any of the alleged Wexford policies, failure to comply with safety protocols and deliberate understaffing, were the moving force behind the constitutional violations. Plaintiffs claim that Wexford and IDOC are violating recommendations put forth by the Centers for Disease Control and Prevention ("CDC") are patently false. Wexford is abiding by the Directive implemented at Menard, which complies with the CDC's recommendations. According to Dr. Babich, a regional Medical Director for Wexford, the Directive, which was promulgated by IDOC, is based on sound medical judgment and principles regarding the management of COVID-19. (Doc. 29-1, Case No. 20-cv-01133). He states that Plaintiffs' motions request accommodations which are not covered by CDC Guidelines, such as single man cells. Dr. Babich notes that "while the CDC Guidelines discuss 'minimiz[ing] the number of individuals housed in the same room as much as possible[,]' there is nothing in the CDC Guidelines which mandate single person cells. He also states that Plaintiffs "appear to not understand that medical isolation – which they refer to as 'a much harsher form of incarceration that's almost equivalent to disciplinary segregation,' is actually one of the recommendations provided by the CDC guidelines."

Even if Plaintiffs' statements were true, that CDC safety protocols were not followed at Menard, Wexford asserts these claims do not form the basis of a Section 1983 claim. A CDC recommendation has no force of law, and Plaintiffs do not have a constitutional right to care which comports to CDC recommendations. Section 1983 liability requires a policy to meet federal constitutional standards.

Additionally, Wexford argues that Plaintiffs cannot rely on their allegation of understaffing as the basis to impose injunctive relief. Plaintiffs are seeking for the Court to enforce the COVID-

19 safety guidelines and protocols, and therefore, the alleged policy of deliberately understaffing is not a direct cause of the alleged constitutional violation for which Plaintiffs seek to have the Court resolve.

Second, Wexford argues that Plaintiffs have not identified any "series of bad acts" by Wexford employees from which the Court could infer that a policy exists. They contend that Plaintiffs' only make conclusory allegations that unidentified staff are not complying with CDC recommendations, that unnamed policymakers are not doing anything to enforce the CDC recommendations, and that "as a direct result of this[,] the number of inmate… positive results for the COVID-19 virus went up." (Doc. 29, Case No. 20-cv-01133) (quoting the Motion for Preliminary Injunction). Wexford states that Plaintiffs have not identified specific people failing to do specific things or that anyone at the policy-making level knew these unnamed staff members were violating the CDC guidelines. Crystal Lucas, the Wexford Site Manager at Menard, states that since the pandemic, she has consistently observed health care staff following rules as set forth in the Directive and that no Wexford employee has been counseled or disciplined for any infraction of the Directive or failing to practice appropriate hygiene requirements, wear face masks, or abide by appropriate social distancing requirements. Wexford argues there is no connection between alleged conduct and the resulting constitutional violation. There is no evidence that the increase in the COVID-19 positivity rate is the proximate cause of certain staff members refusing to follow CDC guidelines. There is also no evidence from which it could be inferred that Wexford knew of the conduct.

Finally, Wexford contends that Plaintiffs have not shown irreparable harm. Plaintiffs' assertion that they are in danger of being exposed and that they will suffer irreparable injury – alluding to the possibility of dying as a result of COVID-19 – without an injunction is at best speculation. In support of the argument, Wexford cites the CDC's data of an approximate 2.2% death rate for those infected with COVID-19 in the United States. Specifically, in Randolph

County, the death rate is approximately 1.15% according to the Illinois Department of Public Health. Wexford concludes that "Plaintiffs are basing their assertion that they are likely to suffer irreparable harm because of a 1-3% chance that, if they contract COVID-19 again, they will die." (Doc. 29, Case No. 20-cv-01133). The mere possibility of irreparable harm is insufficient to meet the high standard required for preliminary injunctive relief.

Because Plaintiffs' cannot demonstrate a likelihood of success on the merits of their claim or irreparable harm, Wexford requests for the Court to deny the Motions for Preliminary Injunction.

**ANALYSIS**

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A CHARLES ALAN WRIGHT, ARTHUR R MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948 (5th ed. 1995)). The purpose of such an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). A plaintiff has the burden of demonstrating:

- a reasonable likelihood of success on the merits;
- no adequate remedy at law; and
- irreparable harm absent the injunction.

*Planned Parenthood v. Comm'r of Ind. State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

Once a plaintiff has met this burden, the Court must weigh "the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest." *Id.; Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte,* 735 F.3d at 665. In addition, the Prison Litigation Reform Act provides that a preliminary injunction must be

"narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Finally, pursuant to Federal Rule of Civil Procedure 65(d)(2), a preliminary injunction would bind only the parties, their officers or agents, or persons in active concert with the parties or their agents.

Based on the testimony and pleadings provided, Plaintiffs have failed to demonstrate all of the factors necessary for obtaining a preliminary injunction. As stated at the hearing, Plaintiffs have not shown that they will suffer irreparable harm without the Court issuing a preliminary injunction, and their traditional legal remedies are adequate. All three Plaintiffs have contracted and recovered from COVID-19, and while ongoing studies continue, at this point in time "[c]ases of reinfection with COVID-19 have been reported, but remain rare."[1] Furthermore, Plaintiffs are no longer housed in South Cell House and have not presented any evidence that they will return there. At this stage, Plaintiffs' fear of additional harm resulting from further exposure to the COVID-19 virus is only speculative. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 22 (2008) ("[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy"); *Mich. v. U.S. Army Corps of Eng'r,* 667 F. 3d 765, 788 (7th Cir. 2011) ("there must be more than a mere possibility that the harm will come to pass"). As their pleadings and testimonies do not suggest that they will suffer irreparable harm without the emergency relief requested, a final determination on the merits provides an adequate remedy at law. *See Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) ("harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial.") (internal citations omitted). Accordingly, the requests for a preliminary injunction are denied.

---

[1] The Court has the authority "to take judicial notice of government websites." *Picket v. Sheridan Health Care Center,* 664 F. 3d 632, 648 (7th Cir. 2011) (citing Fed. R. Evid. 201(c)(1)). *See also Bodnar v. Lake Cnty. Jail,* No. 20-cv-157-PPS-APR, 2020 WL 1940742, at * 2 (N.D. Ind. Apr. 22, 2020) (taking judicial notice of the CDC's guidelines for managing COVID-19 in the correctional setting when screening a complaint pursuant to 28 U.S.C. § 1915A).

### DISPOSITION

For the reasons stated above, Plaintiffs' Motions for Preliminary Injunction filed in case numbers 20-cv-01133, 21-cv-00153, and 21-cv-00154 are **DENIED.**

**IT IS SO ORDERED.**

**DATED: May 27, 2021**

 _s/Stephen P. McGlynn_
**STEPHEN P. MCGLYNN**
**United States District Judge**